# WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

150 E. 42nd Street, New York, New York 10017   Tel: (212) 490-3000   Fax: (212) 490-3038

*Albany • Baltimore • Boston • Chicago • Dallas • Garden City • Houston • Las Vegas • London • Los Angeles • McLean*
*Miami • Newark • New York • Orlando • Philadelphia • San Diego • San Francisco • Stamford • Washington, DC • White Plains*
*Affiliates: Berlin • Cologne • Frankfurt • Mexico City • Munich • Paris*

www.wilsonelser.com

June 21, 2010

**VIA ECF**

Honorable Chief Magistrate Judge Steven Gold
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:   *Johnson & Johnson, et al. v. South Pointe Wholesale, et al.*
        Case No.      :   08 Civ. 1297 (SLT)(SMG)
        Topic            :   Request for Pre-Motion Conference to Compel Discovery
        Our File No. :   11361.00001

Dear Magistrate Judge Gold:

We write on behalf of Dennis Cantor and Novex America Inc. (collectively, "Novex") to request leave of the Court to correct misstatements made in Plaintiffs Johnson & Johnson and LifeScan, Inc.'s June 16, 2010 letter to the Court. Novex requested that Plaintiffs clarify their statements, but they have refused (**Exhibit A**). A meet and confer was held on June 18, but Plaintiffs have maintained their positions and refuse to correct their misrepresentations.

As your Honor is aware, a key element in the calculation of Plaintiffs' alleged damages is the price at which they "should have" sold a box of retail packaged One Touch Ultra test strips in the U.S. This figure is contested, with Plaintiffs claiming that it is their List Price, and defendants claiming that Plaintiffs routinely offer discounts off of this price. Although Your Honor stated in the September 30, 2009 conference that defendants are "entitled to the rebates and discounts… [and are] entitled to the net price" (Conference Transcript, p. 37, attached as **Exhibit B**) relating to Plaintiffs' retail packaged Ultra strips, Plaintiffs have maintained that this net price is their list price, continuously denying the existence of any rebates or discounts on retail packaged Ultra. Plaintiffs have thus claimed that no discovery on this issue exists. When explicitly asked by the Court at the September 30 conference, Plaintiffs stated as follows:

> The Court:   Mr. Potter, it's Johnson & Johnson's position that this product is only sold at list price in the United States for distribution in the United States; is that correct?
>
> Mr. Potter:   Yes

This unqualified statement, however, is false. As discussed below, documents referred to by Plaintiffs in their June 18, 2010 letter show Plaintiffs selling U.S. retail packaged Ultra to Wolf Medical Supply, Inc. ("Wolf") at a steep discount – in some cases in excess of 50% off of list price. Plaintiffs seek to dismiss these records by claiming they only stated that discounts are

4035725.1

not offered on U.S. retail packaged Ultra *destined for the retail market.* As the above quote makes clear, however, Plaintiffs have not limited their position regarding the nonexistence of discounts. The Court's inquiry was clear and is the proper inquiry – whether the "product" is sold at prices other than list. Novex is accused of selling counterfeit packaged retail Ultra, not counterfeit packaged retail Ultra destined for the retail market. Plaintiffs sell retail packaged Ultra to various lines of distribution at various prices, and despite Plaintiffs' intention to limit certain sales to certain channels, there was an active secondary market for this product. Thus, the proper inquiry is the price charge for U.S. retail packaged product, not the price Plaintiffs' meant to charged to the retail market. This deviation in pricing is what created the secondary market.

Moreover, the existence of discounts on retail packaged Ultra, regardless of where Plaintiffs intended the discounted product to be sold, is relevant to Plaintiffs' alleged damages. As discussed below, discounted retail packaged goods made their way to the retail market. The diversion of these discounted goods to the retail market indicates that Plaintiffs do not earn their list price from each claimed lost retail sale. Novex has requested that Plaintiffs clarify their misstatements to the Court regarding discounts on retail packaged goods, but they have declined.

In addition, Novex seeks to correct the partial and misleading document chain submitted by Plaintiffs on June 18. Plaintiffs submitted documents that they claim show Wolf paying list price for Plaintiffs' goods and show Plaintiffs providing chargebacks when Wolf it sold them to Walter Reed Army Medical Center. Plaintiffs claim that this shows U.S. retail packaged goods were not being sold to *retail* outlets below their list price, but that they were being sold to Walter Reed below list price. In support, Plaintiffs submitted a Debit Memo from Wolf to LifeScan claiming the sale of 600 50-count boxes of Ultra to Walter Reed (**Exhibit C**), as well as payment documents relating to the rebate provided by LifeScan to Wolf for such sale (**Exhibit D**).

Aside from being the first public acknowledgement that LifeScan sells U.S. retail packaged Ultra below list price, Plaintiffs' document chain only tells half the story. Attached to this letter is a more complete document chain for the transaction submitted by Plaintiffs. The first document in this chain is the purchase from Plaintiffs of 600 50-count boxes of retail packaged Ultra by Wolf on January 4, 2007, for the list price of $41.00 (**Exhibit E**). The second document in this chain is an invoice from Wolf selling these 600 genuine boxes to co-defendant Med-Health Direct (not Walter Reed) at a price of $31.50 (**Exhibit F**). The third document in this chain is a purchase credit memo from Wolf to Lifescan in the amount of $11,340, corresponding to a rebate of $18.90 per box on these retail packaged Ultra strips (**Exhibit G**). The final documents in this chain are those submitted by Plaintiffs, showing the Debit Memo from Wolf to LifeScan and the rebate payment being paid from LifeScan to Wolf (**Exhibits C and D**).

With the full document chain available to the Court, what occurred is clear. Wolf – J&J's Authorized Distributor ("AD") – may have *told* LifeScan that it was selling the retail packaged Ultra to Walter Reed, but it was actually selling them to Med-Health Direct, a secondary market vendor. Regardless of Plaintiffs' intent, Plaintiffs were selling retail packaged Ultra in 50-count boxes at $22.10 and less per box which were making their way into the secondary market. We note that this is not an isolated event, as this has occurred with other vendors.

Thus, despite Plaintiffs' denial, these documents show Plaintiffs, perhaps unintentionally yet perhaps knowingly, selling retail packaged product to Wolf at a discount that was making its way to the retail market. Plaintiffs misconstrue Novex's argument and their own past statements when they claim that LifeScan does not provide discounts off of its retail One Touch Ultra strips

4035725.1

through "legitimate" channels. LifeScan's intention not to do so is irrelevant to the reality of what is occurring in the market, and the plain fact that LifeScan has not earned their list price on all sales of U.S. retail packaged Ultra. Indeed, the sales identified in the Wolf documents, for which Plaintiffs' made far less than their list price, were being made to other defendants in this case, and thus unquestionably impact Plaintiffs' alleged actual damages calculation.

The entire existence of the alternate source market for retail packaged strips is predicated on the availability of these strips at prices below Plaintiffs' list price. This market was flush with genuine goods during the operative timeframe of this case, as the Sixth Amended Complaint itself points out that South Pointe Wholesale (at the time a LifeScan AD) purchased 443,000 boxes of LifeScan product on the secondary market between April of 2006 and April of 2008. The Complaint alleges that 74,448 of these boxes were in counterfeit packaging – only 16.8% of South Pointe's secondary market purchases. Thus, the other 368,552 alternate-sourced boxes were genuine, and must have been sold below Plaintiffs' list price.

In order for this genuine product to be available on the secondary market, Plaintiffs must have at some point sold it below list price. If Plaintiffs only sell product intended for the retail market at list price, the secondary market – which was immense, as South Pointe's numbers indicate – must be obtaining this product from channels not intended for retail. Wolf is but one example of how this occured. In order to discover the true amounts Plaintiffs may have earned from the sale of retail packaged Ultra, Novex must be allowed to explore the structure and specifics of Plaintiffs' sales of retail packaged Ultra regardless of its intended market destination, such as sales at GPO prices and through other discount channels, which Plaintiffs now admit exist. As Your Honor stated, Novex is "entitled to the net price," on this product, taking into account rebates and discounts. Only with this information will Novex be able to begin forming a true picture of how much profit LifeScan may have lost based on a "displaced" sale in the U.S.

In addition, Novex wishes to correct further misstatements in Plaintiffs' letter; namely, Plaintiffs claim that Novex did not provide them documents prior to requesting a pre-motion conference with the Court, and claim that Novex did not offer to meet and confer with Plaintiffs regarding this dispute. Both statements are incorrect. Novex notified all parties on June 8, 2010, that it was in receipt of documents subpoenaed from Wolf (**Exhibit H**). On June 14, 2010, Plaintiffs responded to Novex's notice requesting said documents, which Novex provided immediately. Moreover, Novex's numerous letters repeatedly offered Plaintiffs the opportunity to meet and confer on the issues being raised, but Novex was never contacted by Plaintiffs other than through letters reaffirming their positions denying Novex's requests.

Thus, with these clarifications and for the reasons set out in its underlying letter, Novex again requests that a pre-motion conference to make a motion to compel Plaintiffs to comply with Novex's discovery requests and 30(b)(6) deposition notice be scheduled.

Thank you in advance for your continued consideration of Novex's concerns.

Very truly yours,

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

Adam R. Bialek

4035725.1

June 21, 2010
Page 4

cc:  Christos Yatrakis, Esq.
     Scott Smedresman, Esq.

     Defendant Service List

4035725.1